**Gary W. WILLIAMS and Wilma Sue Williams, Appellants–Defendants,**

**v.**

**Gene ROGIER and Joan Rogier, Appellees–Plaintiffs.**

No. 65A01–9205–CV–140.

Court of Appeals of Indiana, First District.

March 31, 1993.

Transfer Denied June 9, 1993.

Leslie C. Shively, Noffsinger, Price, Bradley & Shively, Evansville, for appellants-defendants.

George C. Barnett, Jr., Cedric Hustace, Bowers, Harrison, Kent & Miller, Evansville, for appellees-plaintiffs.

NAJAM, Judge.

## STATEMENT OF THE CASE

This is an appeal from a judgment in favor of Gene Rogier and Joan Rogier ("Rogiers") on their complaint to quiet title to approximately ¼ acre consisting of two strips of land along opposite sides of their one acre residential tract ("disputed area"). In the judgment, the trial court also denied the affirmative defenses and the counterclaim to quiet title to the same area asserted by Gary W. Williams and Wilma Sue Williams ("Williams"). We affirm.

## ISSUES

We consolidate and restate the issues on appeal as follows:

1. Did the trial court err in its determination that the Rogiers had acquired title to the disputed area by adverse possession?

2. Is the Rogiers' adverse possession claim barred by laches because they had knowledge of a property line dispute with Williams but did not assert their claim until after Williams had incurred development costs?

3. Did the Rogiers effectively disavow their adverse possession claim?

## FACTS

The facts most favorable to the judgment disclose that Marguerite Lannert Elles originally owned a 160 acre tract of land in Vanderburgh County. In 1948, Elles conveyed a 1¼ acre parcel from this tract to her sister Mary Lannert Dannenberg and to Mary's husband, Conrad. The Dannenbergs subsequently erected a fence on three sides of their 1¼ acre property ("Fence") which fronted on Schlensker Road.

In 1969, the Dannenbergs reconveyed ¼ acre from the 1¼ acre property to Elles, and they and Elles simultaneously conveyed the remaining one acre to Charles and Edna Austill by a separate warranty deed. However, the entire 1¼ acre parcel remained enclosed by the Fence along the

South, East and West sides. On April 15, 1977, the Austills conveyed their one acre to Alfred and Beverly Render ("Renders"), and on March 7, 1980, the Renders deeded the same one acre to the Rogiers. The Rogiers remained in title and possession of this one acre at all relevant times thereafter to the date of judgment.

On November 8, 1989, Williams executed a purchase agreement with the heirs of Marguerite Lannert Elles to purchase the remaining 159 acres of the original 160 acre tract. Williams acquired legal title to the 159 acre tract by warranty deed, dated October 31, 1990.

Before acquiring title, Williams took steps to subdivide and develop the 159 acre tract. In December, 1989, Williams employed Billy T. Nicholson, a land surveyor, ("Nicholson"), to survey the property, and Nicholson placed a stake inside the Fence near the northeast corner of the Rogiers' property, which was also the northwest corner of Lot 1 in a proposed minor subdivision. After the survey was completed Gary Williams spoke briefly with Joan Rogier in her yard. Williams showed Rogier a map and explained to her that he planned to develop a residential subdivision next to her property. On that occasion, Williams and Rogier did not discuss the survey stake located in the northeast corner of the Rogiers' yard or its significance.

Williams filed an application with the Evansville and Vanderburgh County Area Plan Commission and on December 27, 1989, Williams gave the Rogiers written notice of intent to develop Sycamore Hill Estates, a two lot minor subdivision, on the property located adjacent to and east of the Rogiers' property. Williams included with this notice a survey plat of the proposed minor subdivision. The plat was approved, and on February 2, 1990, the plat was recorded.

Beginning in February 1990, Williams continued with development of a major subdivision on land adjoining the minor subdivision. This site work included field engineering, grading, excavation, installation of water and sewer utilities and other related infrastructure, all at some distance from the disputed area. This work did not involve the disputed area.

In May of 1990, the Rogiers requested their abstract of title from the bank which held their mortgage, "To try and figure out what the stake meant." Record at 450. After reading the abstract they surmised from the chain of title that in 1969 the 1¼ acre parcel had been reduced to one acre, and they then sought legal advice. By letter, dated November 26, 1990, the Rogiers' attorney notified Williams that the Rogiers claimed ownership of all of the acreage enclosed within the Fence and offered Williams $750.00 to purchase the disputed area. The price offered also included an easement on the Williams' property for the continued use of the Rogiers' septic system. Williams declined the offer.

On February 4, 1991, the Rogiers filed a complaint to quiet title to the disputed area, and on February 26, 1991, Williams filed an answer, affirmative defenses and counterclaim to quiet title to the same area. Williams requested findings of fact and conclusions of law under Trial Rule 52. Following a bench trial, the trial court found that the Rogiers had acquired title to the ¼ acre by adverse possession and entered judgment for the Rogiers. Williams appealed. We will state additional facts in our discussion as needed.

## DISCUSSION AND DECISION

### *Standard of Review*

When reviewing a judgment accompanied by requested findings of fact and conclusions of law, we are bound by a limited standard of review. *Cap Gemini America, Inc. v. Judd* (1992), Ind.App., 597 N.E.2d 1272, 1278, *trans. denied.* Our review is two-tiered: we first determine whether the evidence supports the findings and then determine whether the findings support the judgment. *Kaminszky v. Kukuch* (1990), Ind.App., 553 N.E.2d 868, 870, *trans. denied.* We will reverse only if we conclude that the findings are clearly erroneous. *Judd*, 597 N.E.2d at 1278–79. In deciding whether the special findings are clearly erroneous, we consider only the evi-

dence which supports the judgment, and we will affirm the judgment unless the record is devoid of facts or inferences supporting the trial court's findings. *Id.* at 1279.

### *Issue One: Adverse Possession*

Williams owned record title to the disputed area. In various respects, Williams claims that the evidence presented by the Rogiers to defeat the record title by adverse possession was insufficient to support the trial court's findings of fact, and that the findings do not support the judgment. We cannot agree.

■ Record title is the highest evidence of ownership, and is not easily defeated, but record title may be defeated by adverse possession. *McCarty v. Sheets* (1981), Ind., 423 N.E.2d 297, 300. It is well settled that in order to establish title to real estate by adverse possession, the adverse claimant has the burden of proving that such possession was (1) actual; (2) visible; (3) open and notorious; (4) exclusive; (5) under claim of ownership; (6) hostile; and (7) continuous for the statutory period. *Penn Central Transportation Co. v. Martin* (1976), 170 Ind.App. 519, 524, 353 N.E.2d 474, 476, *trans. denied.* A party who sustains that burden acquires title to the disputed real estate by operation of law, and the original owner's title is thereby extinguished. *Snowball Corp. v. Pope* (1991), Ind.App., 580 N.E.2d 733, 734.

■ Our legislature has imposed an additional requirement upon a party who claims title by adverse possession. The adverse claimant must pay all taxes and special assessments falling due on the real estate during the period adverse possession is claimed. IND.CODE § 32-1-20-1. However, our courts have recognized an exception to this statutory requirement where the disputed real estate lies adjacent and contiguous to other property owned by the claimant and taxes have been paid according to the tax duplicate. *Echterling v. Kalvaitis* (1955), 235 Ind. 141, 147, 126 N.E.2d 573, 575. In adverse possession cases where boundary disputes arise due to the erection of fences, payment of taxes for the disputed property is not considered an additional element of an adverse possession claim. *Connors v. Augustine* (1980), Ind.App., 407 N.E.2d 1186, 1189. The erection of a fence or other structure serves as sufficient notice to the adjoining titleholder. *Id.*

■ Williams first contends that the findings are not supported by the evidence. Specifically, Williams argues that the Rogiers failed to prove that either their acts of ownership within the disputed area, or the acts of their predecessors, were sufficient to vest title in the Rogiers. Williams asserts that the only possessory acts spanning the entire ten-year statutory period consisted of periodic maintenance of the property up to the fence.

Williams also contends that two specific findings are clearly erroneous. First, Williams attacks the finding that, "title to the entire 1¼ acres was probably established in the party possessing the area within the Fence 20 years after Marguerite Lannert Elles conveyed the original parcel in 1948." *See* Record at 868. We need not address the sufficiency of that finding, however, because it was not dispositive. The term "probably established" used by the trial court does not constitute a finding of fact but a mere suggestion, in the nature of dicta. Similarly, Williams argues that the trial court's finding that, "The Rogier [sic] bought the entire 1¼ acres and are the exclusive owners of the entire 1¼ acre parcel within the fence" is clearly erroneous. *See* Record at 869. We agree with Williams but conclude again that the finding was not dispositive.

Setting aside these superfluous findings, we conclude that the trial court's other findings are supported by the evidence. The record shows that the Fence remained in place along three sides adjacent to the Williams property during the entire period when the Renders and the Rogiers were owners of the one acre tract. The record further shows that the Renders and the Rogiers considered themselves owners of the entire area within the Fence, that they did not consider their occupation subser-

vient to their neighbor's title, that they both exercised numerous acts of dominion beyond mere possession, and that in all respects they acted as the sole owners of the disputed area using the land in a manner consistent with its normal purposes during their respective periods of possession. *See Kline v. Kramer* (1979), 179 Ind.App. 592, 599, 386 N.E.2d 982, 988. Finally, the record shows that these acts of possession occurred continuously for a period of at least ten (10) years, as required by IND.CODE § 34-1-2-2(6). Thus, we are satisfied that the evidence in the record supports the trial court's essential findings.

■ We must next decide whether the findings of fact support the conclusions of law and judgment. Williams argues that the trial court's findings do not support the judgment because those findings fail to address each element of the Rogiers' adverse possession claim. We do not require such precision in special findings. On review, we must determine merely whether specific findings are adequate to support the trial court's decision. *Matter of Estate of Kroslack* (1991), Ind.App., 570 N.E.2d 117, 121. Findings are adequate if they disclose a valid basis under the issues to support the result reached in the judgment. *Id.*

The trial court entered the following findings of fact which we assign numbers for purposes of our discussion:

"1. Plaintiffs (Rogier) bought real estate commonly known as Rural Route 8, Box 175, Schlensker Road, Evansville, Vanderburgh County, Indiana on March 7, 1980 from the Renders who had owned it since April 15, 1977.

2. A fence surrounded the property on three sides when Rogier bought it.

3. The legal description to the premises claimed by Rogier does not include all the realty within the fence.

4. Defendants (Williams) own realty abutting the Rogier property and the legal description to Williams's land includes a portion of the real estate within the fence.

5. Approximately ¼ acre is in dispute. The real estate in question is described in the December 18, 1989 Survey Report of Billy T. Nicholson filed with the Court April 18, 1991.

6. Williams acquired title to the adjoining land October 31, 1990 but had an agreement to purchase the property in November, 1989.

7. The property within the fence lines had been part of a 160 acre tract owned by Marguerite Elles. 159 acres of this tract was the land acquired by Williams in 1989.

8. Elles conveyed 1¼ acres (the ¼ being the property in dispute) to her sister and brother-in-law November 1, 1948.

9. On February 21, 1969 the then record owners of the 1¼ acres, Marguerite Lannert Elles and her sister and brother-in-law, conveyed 1 acre to the Austills. The ¼ acre was rejoined, legally, to the 158¾ acres.

10. The Austills sold their interest to the Renders.

11. From the time of Marguerite Elles until the present the 1¼ acres within the fence was treated as a single parcel.

12. Renders considered themselves owners of all property within the fence and did not allow anyone else to use any portion of it. They mowed all of the 1¼ acres. Each year they planted and maintained a garden which abutted the west fence line. They cleared debris from the property up to both the east and west fence lines. They used the septic system which was installed up to the east fence line.

13. Renders, Rogiers and Williamses paid the taxes on their property as called for by the tax duplicates they received.

14. Rogiers always believed they owned all property within the fence. They mowed and cared for all of the fenced area. They planted trees, flowers, grapevines and a garden on the disputed area. They built a wooden clubhouse on the land in dispute. They used the septic system which crossed the disputed area. They continuously used all the area as their own and no one else ever used the property within the fence.

15. Williams notified Rogier of their plans to build a subdivision which included the disputed area. This notice was in person in the Fall of 1989 and by certified mail in the Winter of 1990."

Record at 867–68. From these findings of fact, the trial court made the following conclusion, which is the only dispositive conclusion of law contained within the judgment:

"At a minimum, title by adverse possession was established by operation of law in Rogier April 16, 1987 when the Render's [sic] 3 year adverse possession and Rogier's [sic] 7 years adverse possession were tacked together."

Record at 868–69.

■■■ The findings of fact support each element of the Rogiers' adverse possession claim. Findings 2, 12, 13, and 14 are sufficient to support a determination that the Rogiers' possession of the disputed ¼ acre was actual, notorious, continuous, visible and exclusive. *See Dowell v. Fleetwood* (1981), Ind.App., 420 N.E.2d 1356, 1359 ("use of land as pasture or garden, up to fence line, under mistake as to true boundary line, evinces open and notorious, visible and exclusive occupancy"). Williams correctly notes that periodic or sporadic acts of ownership such as maintenance activities, standing alone, are insufficient to establish title by adverse possession. *See Carter v. Malone* (1989), Ind.App., 545 N.E.2d 5, 6. However, cases of adverse possession are fact-sensitive and must be decided on an individual basis. *McCarty,* 423 N.E.2d at 300. Maintenance activities *and* additional activities of a more permanent nature are sufficient to establish continuity of adverse possession. *See id.* at 300–01. For residential land, the presence of permanent improvements such as border fences or buildings which are in place during the entire statutory period can be sufficient to establish adverse possession.[1] *See Beaver v. Vandall* (1989), Ind., 547 N.E.2d 802, 804; *see also Greene v. Jones* (1986), Ind.App., 490 N.E.2d 776, 779,

*trans. denied* (holding fence erected on property not sufficient because not in place during entire statutory period).

The Rogiers' possession of the disputed areas included more than periodic and sporadic lawn care. Here, the existence of the Fence is significant. The Rogiers claim adverse possession of property enclosed within a fence erected for well over ten years. The Fence established a boundary line which was clearly delineated. The Rogiers, and the Renders before them, continuously maintained the fenced area as their own property.

■■■ Finding 14 establishes both the Rogiers' claim of ownership to the disputed area and that such claim was hostile. Claim of ownership may be inferred if a party in possession "places permanent structures upon the land of another and thereafter uses such land and structure in the same manner that an owner ordinarily uses his land." *Penn Central,* 170 Ind. App. at 524, 353 N.E.2d at 477.

■■■ Finding 11 establishes that Williams and their predecessors in title were on notice of an adverse claim. Here again, the existence of the fence is significant. The Fence put Williams on notice that the Rogiers asserted dominion over the disputed area. No further notice is required for purposes of an adverse possession claim when the hostile acts are so manifest and notorious that reasonable owners should be aware of them. *Estate of Mark v. H.H. Smith Co.* (1989), Ind., 547 N.E.2d 796, 800. The Fence, together with the customary acts of ownership, were sufficient to support a finding of notorious possession of the dispute area.

Findings 1, 12, and 14 further indicate that the Rogiers maintained continuous possession for the requisite ten-year period by tacking with the Renders' continuous possession. It is settled that successive periods of tenancy by different tenants may be tacked to constitute the necessary period for adverse possession to defeat the title of the record owner. *Cooper v. Tarp-*

---

1. We do not mean to suggest that the mere presence of a fence, standing alone, is sufficient to establish adverse possession of disputed property enclosed by a fence. The adverse claimant must also occupy the property under a claim of right.

*ley* (1942), 112 Ind.App. 1, 8, 41 N.E.2d 640, 643. Finally, findings 12, 13 and 14 establish that the Rogiers were not required to pay taxes on the disputed property.

We conclude that the trial court's findings are adequate to establish each element of the Rogiers' adverse possession claim. The fact that the trial court did not enter a specific finding regarding each element does not constitute reversible error. The trial court is not required to recite the recipe for adverse possession in order for the findings to support the judgment. *Cf. Slauter v. Favorite, Guardian* (1886), 107 Ind. 291, 300, 4 N.E. 880, 886 (absence of words "negligence" and "fraud" in findings does not render judgment erroneous).

Moreover, the purpose for special findings is to provide the parties and the reviewing courts with the theory upon which the case was decided. *Sandoval v. Hamersley* (1981), Ind.App., 419 N.E.2d 813, 816, *trans. denied.* The trial court need not recite the evidence in detail as long as the ultimate facts found are stated in the findings. *Id.* When considering the adequacy of special findings of fact, we will consider the findings as a whole and liberally construe them in favor of the judgment. *K.B. v. S.B.* (1981), Ind.App., 415 N.E.2d 749, 754.

We recognize that the trial court's findings might have been more detailed. As noted above, two of the trial court's findings are erroneous. Nevertheless, to the extent that the judgment is based on erroneous findings, those findings are superfluous and are not fatal to the judgment if the remaining valid findings and conclusions support the judgment. *Jackson v. Farmers State Bank* (1985), Ind.App., 481 N.E.2d 395, 404. The remaining findings are adequate for our review on appeal, and when we consider them in their entirety, we are satisfied that the trial court's findings support the conclusion of law that the Rogiers acquired title to the disputed area by adverse possession.

### Issue Two: Laches

Williams also argues that because the Rogiers had actual or constructive knowledge of both a dispute over their property line and the Williams' intent to develop the adjacent property, the equitable doctrine of laches operates to divest the Rogiers of title by adverse possession. Williams' reliance on this doctrine is misplaced. Laches is an implied waiver resulting from knowing acquiescence in existing conditions and an inexcusable delay in asserting a right which results in prejudice to the adverse party. *Simon v. Auburn Board of Zoning Appeals* (1988), Ind.App., 519 N.E.2d 205, 215. In other words, laches addresses delay in the pursuit of a right when a party must assert that right in order to benefit from it.

Here, there was no delay attributable to the Rogiers which would invoke the doctrine of laches. Fee simple title vests in the adverse possessor by operation of law at the moment the requisite conditions for adverse possession have been established for the statutory period. *Snowball*, 580 N.E.2d at 734. The adverse possessor is not required to take any further steps to acquire title once those conditions have been met. The statute of limitations runs against the title holder, not the adverse claimant. *See Greene v. Jones* (1986), Ind.App., 490 N.E.2d 776, 777.

The Rogiers, and their immediate predecessors in interest, asserted their claim by maintaining adverse possession of the disputed area for the entire statutory period. There was no significant delay because the Rogiers were under no obligation to take further action once they had acquired title by operation of law.

Furthermore, the Rogiers' inaction did not prejudice Williams. Any disadvantage which Williams suffered resulted from Williams' own insistence on commencing with development prior to resolution of the boundary question. Nicholson, the surveyor employed by Williams, testified that while performing the survey in mid-December, 1989, "We ran into a problem with the Rogier property." Record at 551. Nicholson testified that when he discovered that a part of Williams' property was located within the Fence line along the Rogiers'

property, he brought that fact to Gary Williams' attention. Record at 597–98. Nicholson stated that Williams considered whether to "honor the fence" or "go to the survey lines," and that Williams decided, in effect, to ignore the Fence. *See* Record at 598. These facts establish that Williams was not entitled to equitable relief.

 Further, we cannot balance the equities on appeal. That task is not within our prerogative as a reviewing court; application of the doctrine of laches is within the sound discretion of the trial court and will be reversed only for an abuse of that discretion. *Siddall v. City of Michigan City* (1985), Ind.App., 485 N.E.2d 912, 916. Laches is an affirmative defense on which Williams bears the burden of proof, and Williams appeals from a negative judgment on that issue. A negative judgment may be attacked only as being contrary to law. *Givens v. Rose* (1978), 178 Ind.App. 590, 595, 383 N.E.2d 448, 452. We will reverse a negative judgment only when we find no evidence to support the judgment and we reach a definite and firm conviction that a mistake has been made. *Lucas v. Frazee* (1984), Ind.App., 471 N.E.2d 1163, 1167. Where, as here, the issue is one in equity tried before a court and not a jury, the judgment on that issue will be reversed only if it is clearly erroneous. *See Burnett v. Heckelman* (1983), Ind.App., 456 N.E.2d 1094, 1097. We find no such error on the question of laches.

### Issue Three: Acquiescence and Disavowment

 In a related argument, Williams contends that in 1989, before the Rogiers had been the record owners of the one acre parcel for a ten-year period, the Rogiers acquiesced in Williams' claim and disavowed their own claim to the disputed area. Williams had surveyed the area, placed a stake within the Rogiers' yard, announced his development plans and given the Rogier's written notice. Williams concludes that the Rogiers' passive response under these circumstances constituted a disavowment of their conflicting claim. Williams apparently reasons that as a result of the Rogiers' alleged acquiescence, the Rogiers' claim lost its adverse character. We find that no disavowment occurred here.

We have determined that there is no error in the trial court's conclusion of law that title had already vested in the Rogiers by operation of law in 1987. *See Issue One.* Hence, the Rogiers did not have to "assert their claim" to the disputed area to avoid disavowment of a claim which had already fully ripened into title. Even had the Rogiers agreed that the Nicholson survey was accurate, such an agreement would not have amounted to disavowment of their claim. *See Kline,* 179 Ind.App. at 597, 386 N.E.2d at 987 (once title has vested in party at conclusion of ten-year possessory period, title is not lost, abandoned or forfeited even if that party subsequently expresses satisfaction with survey results inconsistent with property adversely possessed by him).

 Likewise, the Rogiers' offer to buy the disputed property from Williams was an offer of settlement and did not constitute a disavowment of their title. *See id.* (no forfeiture after title vests by adverse possession if party states he does not own land and offers to buy). Although evidence of the Rogiers' offer was introduced, an offer of settlement is usually inadmissible. The law favors the voluntary resolution of disputes, and where an offer of settlement is introduced it should not be given probative value in resolving a disputed issue on the merits. The claim of acquiescence and disavowment must fail.

The judgment is affirmed.

BAKER and RUCKER, JJ., concur.